IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
May 8, 2007 Session

**STATE OF TENNESSEE v. RAYMOND DESHUN ROSS**

**Direct Appeal from the Circuit Court for Henderson County**
**No. 05-082-1    Roy B. Morgan, Jr., Judge**

---

**No. W2006-01167-CCA-R3-CD  - Filed November 2, 2007**

---

A Henderson County Circuit Court jury convicted the appellant, Raymond Deshun Ross, of carjacking; aggravated assault; theft of property valued more than one thousand dollars but less than ten thousand dollars; and misdemeanor reckless endangerment as a lesser included offense of attempted second degree murder.  The trial court sentenced him to twenty, ten, and eight years and eleven months, twenty-nine days, respectively, and ordered that he serve the twenty- and ten-year sentences consecutively for an effective thirty-year sentence.  On appeal, the appellant contends that (1) the evidence is insufficient to support the convictions because it fails to show he was the perpetrator of the crimes; (2) the trial court erred by sentencing him as a Range II, multiple offender because the State failed to file a notice of enhanced punishment; and (3) the trial court erred by ordering consecutive sentencing.  We conclude that the evidence is sufficient to support the convictions and that consecutive sentencing was appropriate in this case.  However, we conclude that the trial court erred by sentencing the appellant as a Range II, multiple offender and that the appellant's conviction for misdemeanor reckless endangerment must be merged into his conviction for aggravated assault.  Therefore, we remand the case to the trial court for resentencing the appellant as a Range I, standard offender and for the entry of a corrected judgment for aggravated assault to reflect the merger.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part, Reversed in Part, and Case Remanded.**

NORMA McGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JERRY L. SMITH, J., joined.

Hewitt Chatman, Jackson, Tennessee, for the appellant, Raymond Deshun Ross.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Jerry Woodall, District Attorney General; and Bill Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

# I. Factual Background

This case relates to the appellant's assault of the seventeen-year-old victim, Troy Lee Bowman, III. At trial, Amber Nicole Gettings testified that on the evening of February 15, 2005, she was at her grandmother's house at 292 Derryberry Street with Lindsay Zaitz and that the two of them were outside in the backyard. Gettings stated that she saw three vehicles pull into the area near the old Salant and Salant warehouse nearby. One of the vehicles was a minivan; the second vehicle was a black Chevrolet Blazer; and the third vehicle was a brown, older-model car. The victim jumped out of the minivan and began running, and an African-American male jumped out of the minivan and began chasing him. The victim fell, and the African-American male, who was wearing a red shirt and light-colored blue jeans, "was on him." The male returned to the minivan, and the three vehicles left the scene with the Blazer traveling in one direction and the other two vehicles traveling in the opposite direction. Gettings went next door to her uncle's house and had him telephone the police. She stated that she knew the victim on February 15 but did not immediately realize he was involved in the assault.

On cross-examination, Gettings testified that trees were behind the Salant and Salant warehouse but that she could see through them. She said she did not know what time the assault occurred, but she acknowledged that it was dark outside and that she could have been as far as three hundred feet away. From that distance, she could not positively identify the appellant. She stated that the Blazer was black, not gold, and that it was not a PT Cruiser. On redirect examination, Gettings testified that streetlights were shining in the area of the assault. After her uncle telephoned the police, Gettings went to the crime scene, spoke with officers, and positively identified the victim.

Lindsay Zaitz testified that she was outside with Amber Gettings on the night of February 15, 2005, and that Gettings alerted her to a fight at the Salant and Salant warehouse. When Zaitz looked toward the warehouse, she saw that the victim's attacker was wearing a red shirt. After assaulting the victim, the attacker got into a vehicle and left the scene. Zaitz said that three vehicles were present, that one vehicle was a black PT Cruiser, and that another vehicle was an older-model car. On cross-examination, Zaitz testified that a van also may have been present but that she did not see it. She stated that trees were between her and the crime scene but that she could see through a clearing. She said that the assault occurred under a streetlight and that the attacker's red shirt "just kind of stood out." She acknowledged that the assault occurred about three hundred feet away from her.

Lexington Police Department Officer David Stanhope testified that on the evening of February 15, he was dispatched to a disturbance on Derryberry Street, which is behind the old Salant and Salant building. When Officer Stanhope arrived, he noticed people behind the building and pulled up to the scene. The victim was lying on his back in the parking lot and was unconscious. The victim's feet were crossed at his ankles, his hands were clenched into fists, and his fists were drawn up to his chest. The victim could not open his eyes and was unresponsive, and Officer Stanhope noticed marks on his head and face. The victim's necklace was broken, and Officer

Stanhope called for an ambulance and spoke with witnesses. On cross-examination, he acknowledged that his log showed he responded to the scene at 7:43 p.m.

Dr. Joe Wilhite testified that he treated the victim in the Henderson County Community Hospital emergency room on February 15. The victim had a head injury, a laceration over his left eye, and abrasions. The victim also had clenched fists and a Glasgow rating of five, indicating that his head injury was severe. Dr. Wilhite stated that the victim's head injury was life-threatening and that he did not expect the victim to live. The victim was stabilized and was flown to Jackson for further treatment. On cross-examination, Dr. Wilhite testified that when the victim arrived at the emergency room, he was unresponsive but was breathing on his own.

The victim testified that at the time of the assault, he was a senior at Lexington High School. In order to pay for a graduation trip to Florida, the victim planned to sell the stereo in his 1997 two-door gold Blazer. The truck had twenty-inch rims, Euro taillights, and a stereo system worth about one thousand dollars. The victim stated that the Blazer was worth about five thousand dollars, that he paid two thousand to twenty-five hundred dollars for the wheels and tires, that the truck had a compact disc player worth about three hundred dollars, and that it had a stereo system worth one thousand dollars. In total, he estimated that the truck was worth ten to eleven thousand dollars. He stated that he did not remember anything about the assault but that he later woke up on the "rehab floor" in Jackson. The victim was in Jackson for three weeks to relearn how to walk and talk. He stated that he did not know the appellant and that the appellant had no reason to have his Blazer. He stated that when he finally saw his Blazer, it was "beat up" and looked like it had been burned. The truck had been stripped of its rims, tires, and stereo equipment, and none of the missing items were returned to the victim.

On cross-examination, the victim acknowledged that based on his estimates, the total value of the Blazer was eight thousand eight hundred dollars. He said he did not remember if he ever met the appellant. On the morning of the assault, the victim went to traffic court for a ticket, but he did not remember anything else about that day.

Lieutenant Donna Hetherington of the Lexington Police Department's Criminal Investigations Division testified that she was the second officer to respond to the Salant and Salant warehouse on the night of February 15. The victim was lying on his back with his legs crossed at his ankles. His arms and fists were clenched to his chest, and he was unresponsive. From her training, Lieutenant Hetherington knew these were signs of severe head trauma. After the victim was removed from the scene, Lieutenant Hetherington went to the emergency room and spoke with the victim's parents. Based on their description of the victim's Blazer, a "be on the lookout" (BOLO) was issued for the vehicle. The next day, Lieutenant Hetherington received a call from Patrolman Jimmy Arnold in Humboldt, Tennessee. Patrolman Arnold told her that he believed he had stopped the Blazer in question the previous night but that he had been unaware of the BOLO at that time. Officer Arnold told her that he had a video camera in his patrol car and that he may have captured the Blazer on videotape. Lieutenant Hetherington went to Humboldt, met with Patrolman Arnold, and viewed the tape. She stated that on the tape, Patrolman Arnold could be seen approaching the

rear of the Blazer. Lieutenant Hetherington later learned that the Gibson County Sheriff's Department had found the victim's Blazer in a field.

Lieutenant Hetherington testified that the appellant was not arrested until July 2005. She interviewed the appellant twice and read him Miranda warnings before each interview. In the appellant's first statement on July 21, 2005, he told Lieutenant Hetherington that he should not have "left this place these/there rims on this truck or whatnot. My crime in detail is that I took a jack and borrowed a four-way lug and stole some rims. I'm not saying I didn't get [the] radio. I've just stolen so much that it's a blur." In the appellant's second statement on July 25, he stated that he stole the rims off a parked vehicle and that he left the vehicle where he found it. Lieutenant Hetherington stated that a person could drive from Lexington to Humboldt in about one hour.

On cross-examination, Lieutenant Hetherington testified that police found shoes, a winter-type hat, and a broken necklace at the crime scene. The victim's mother identified the items as the victim's. Lieutenant Hetherington stated that she could not tell from Patrolman Arnold's video if the Blazer in the video was the victim's Blazer.

Patrolman James Arnold of the Humboldt Police Department testified that he already knew the appellant at the time of this incident. On the night of February 15, a man named Charlie Ward told Patrolman Arnold that he had allowed the appellant to borrow his 1989 Ford Ranger pickup truck and that the appellant had not returned it. Patrolman Arnold began looking for the pickup. About 9:30 p.m., he found the pickup truck parked in a driveway on Sawyer Drive. A gold Blazer with a Henderson County license plate was also in the driveway. Patrolman Arnold approached the Blazer and saw the appellant sitting in the driver's seat. The Blazer had chrome rims, and the appellant was wearing a red shirt, a headband, blue jeans, and bands around his arms. A man named Robert Treadway was sitting in the Blazer's passenger seat. Treadway told Patrolman Arnold that he was working on the Blazer, and Patrolman Arnold did not suspect anything unusual because he knew that Treadway worked on cars. Patrolman Arnold spoke with the appellant and called a wrecker for the pickup truck. Patrolman Arnold said the appellant "began pulling some items from the back-end of the pickup truck. It was like a chrome-plated stereo amplifier that had some flames on it, and there was a speaker box." The appellant told the officer that the stereo equipment came out of his Pontiac Bonneville. The next day, a Blazer matching the one Patrolman Arnold had seen was found in Gibson County.

The State recalled the victim to testify. The victim testified that the stereo in his Blazer was "a black box like a hexagon shape, three tens in the inside of it, plexi-glass front on it where you could see the speakers." He stated that the amplifier was "silver-looking, chrome-looking . . . with chrome flames on the top of it." The victim stated that he had never seen anyone with a stereo like his. On cross-examination, the victim testified that on February 15, he was supposed to meet with a friend, Domingo Thomas, about buying the stereo but that "I think he backed out on that day. I don't really remember it."

-4-

Dr. Herbert Lee Sutton, a trauma surgeon, testified that he treated the victim in Jackson on February 15, 2005. The victim was unconscious when he arrived from Lexington, was in critical condition, and was on a ventilator. The victim was on the ventilator for ten days to two weeks. He progressed slowly and woke up enough to follow commands and walk in the hospital hallway. The victim was discharged to rehabilitation on March 8, where he remained until June 28. The victim received rehabilitation because he could not go to the bathroom by himself and could not function normally. On cross-examination, Dr. Sutton testified that most patients with the victim's type of head injury did not remember anything about how they were injured.

Robert Franklin Rice, an investigator for the Twenty-Sixth Judicial District Public Defender's Office, testified for the appellant that he took photographs of the crime scene on February 26, 2006. The distance from the crime scene to a gray house beside Amber Gettings' grandmother's house was three hundred two feet. The grandmother's house was an additional twenty-five to thirty feet away from the Salant and Salant warehouse. Although the appellant had been charged with attempted second degree murder, the jury convicted him of misdemeanor reckless endangerment as a lesser included offense. The jury also convicted the appellant of the charged offenses of carjacking, a Class B felony; aggravated assault, a Class C felony; and Class D felony theft.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions because the evidence failed to establish his identity as the perpetrator. The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The State may prove a criminal offense by direct evidence, circumstantial evidence, or the combination of the two. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). Before a jury may

convict a defendant of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971); see also State v. Gregory, 862 S.W.2d 574, 577 (Tenn. Crim. App. 1993). As in the case of direct evidence, the weight to be given circumstantial evidence and "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611).

At trial, Amber Gettings testified that she saw an African-American male wearing a red shirt and light-colored blue jeans chase the victim and assault him. She also stated that she saw a black Chevrolet Blazer at the scene. About two hours later, Humboldt Patrolman James Arnold saw the appellant sitting in the passenger seat of a Blazer that matched the description of the victim's Blazer. The appellant was wearing a red shirt and blue jeans. Patrolman Arnold watched as the appellant took stereo equipment, including a chrome-plated amplifier with flames on it, out of a pickup truck. The victim testified that the stereo stolen out of his Blazer had a chrome amplifier with flames on it and that he had never seen another amplifier like it. The next day, the victim's Blazer was found in Gibson County, and its stereo and rims had been removed. When the appellant was arrested several months later, he admitted taking the rims. Although the appellant never admitted to assaulting the victim, the jury obviously determined that he was the person who chased and beat the victim at the Salant and Salant warehouse on February 15, 2005. Taken in the light most favorable to the State, the evidence is sufficient to support the jury's determination that the appellant was the perpetrator of the crimes.

We note that the appellant's brief also mentions that "there is not proof that he took any vehicle by force." The trial court instructed the jury that it could convict the appellant of carjacking if he "took a motor vehicle from the possession of another by force or intimidation . . . and . . . acted either intentionally or knowingly." See Tenn. Code Ann. § 39-13-404(a)(2). In State v. Henry A. Edmondson, Jr., 231 S.W.3d 925, ___ (Tenn. 2007), No. M2005-01665-SC-R11-CD, 2007 Tenn. LEXIS 662, at *8 (Nashville, Aug. 20, 2007), our supreme court recently explained that the crime of carjacking includes "forcible takings of motor vehicles from victims even when the victim is some distance from his or her car at the time of the taking" and that the time between the taking and the attack on the victim should be instantaneous or almost instantaneous. Given that the victim testified that he did not know the appellant, that he stated there was no reason the appellant should have been in possession of his Blazer, and that eyewitnesses saw the appellant assault the victim and leave in a group with the Blazer, we believe the jury could infer that the appellant took the victim's Blazer by force.

## B. Enhancement Notice

Next, the appellant contends that the trial court erred by sentencing him as a Range II, multiple offender because the State failed to provide notice of its intent to seek enhanced punishment. The State contends that the appellant has waived this issue because he failed to object

at trial and raises this issue for the first time on appeal. The State also argues that, in any event, the appellant is not entitled to Range I, standard offender sentencing because he conceded at the sentencing hearing that he is a Range II offender and has failed to demonstrate prejudice. We conclude that the trial court could not sentence the appellant as a Range II, multiple offender because the State failed to provide any written notice of its intent to seek enhanced punishment.

The State concedes in its appellate brief that it did not file a notice of intent to seek enhanced punishment. At the sentencing hearing, the defense repeatedly acknowledged that the appellant qualified as a Range II offender. However, the appellant's attorney urged the trial court several times to sentence the appellant as a Range I offender because the appellant was a fairly young man, was acquitted of the most serious charge of attempted second degree murder, and "does not have a bad record as such." The court chose to sentence the appellant as a Range II offender, stating that "[t]hat's the only thing appropriate in this case."

Tennessee Code Annotated section 40-35-202(a) provides that "[i]f the district attorney general believes that a defendant should be sentenced as a multiple, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial." The statement "must set forth the nature of the prior felony convictions, the dates of the convictions and the identity of the courts of the convictions." Tenn. Code Ann. § 40-35-202(a). The purpose of the notice requirement "is to provide fair notice to an accused that he is exposed to other than standard sentencing." State v. Adams, 788 S.W.2d 557, 559 (Tenn. 1990). If information in the notice is omitted or incorrect, "the inquiry should be whether the notice was materially misleading." Id. Where an ambiguity or contradiction appears on the face of the notice, the defendant has a duty to inquire further. Id. The defendant must show prejudice to obtain relief. Id.

The State contends that in State v. Livingston, 197 S.W.3d 710 (Tenn. 2006), our supreme court held that "where the State failed to file a notice of intent to seek enhanced punishment for a crime but where the defendant had 'fair warning' that the State intended to seek enhanced punishment, the State had accomplished the purpose of Tenn. Code Ann. § 40-35-202(a)" and that strict adherence to the statute was not required. However, the State's reliance on Livingston is misplaced. In Livingston, the defendant was originally indicted for Class E evading arrest, and the State filed notice of enhanced punishment. Id. at 711. Subsequently, a superseding indictment was issued, charging the defendant with Class D felony evading arrest. Id. Although the State did not amend its notice to seek enhanced punishment, our supreme court held that the original notice sufficiently informed the defendant of the State's intent to seek enhanced punishment. Id. at 716. Unlike Livingston, the State in the present case failed to file any notice to warn the appellant of its intent to seek enhanced punishment. Moreover, as the supreme court explained,

> While "perfect" notice is not required, . . . we have strictly
> applied the requirement of section 40-35-202(a) that some notice
> meeting the minimal requirements of the statute be given. . . .

To reiterate, the notice provision of Tenn. Code Ann. § 40-35-202(a) requires, at a minimum, that the State file: (1) written notice, (2) clearly expressing the State's intention to seek sentencing outside of the standard offender range, (3) setting forth the nature of the prior felony conviction, the dates of the convictions, and the identity of the courts of the convictions.

Id. at 713-14 (footnote omitted).

The State also argues that the instant case is similar to Brooks v. State, 756 S.W.2d 288 (Tenn. Crim. App. 1988), in which the petitioner claimed that his guilty pleas were voidable because the State failed to provide him with written notice of enhanced punishment. Id. at 290. However, this court found the petitioner's claim to be without merit, stating,

First, the petitioner had actual knowledge and was acutely aware he would receive a Range II sentence. Moreover, the petitioner did not complain when the trial judge revealed the petitioner would receive a Range II sentence. Second, the petitioner has failed to illustrate how he was prejudiced by a lack of notice when (a) he agreed to accept the sentence as part of the plea bargain agreement and (b) the pleas were entered before the assistant district attorney general was required to give such notice. See Tenn. R. Crim. P. 12.3(a).

Id. at 291. While the appellant in the present case acknowledged at the sentencing hearing that he qualified as a Range II offender, he repeatedly urged the trial court to sentence him as a Range I offender. Moreover, the appellant's being sentenced as a Range II offender in the instant case was not part of a negotiated plea agreement, and the announcement that he was a Range II offender was made at the sentencing hearing, long after the State's deadline for providing written notice had expired. Therefore, we conclude that Brooks also is too dissimilar from the present case to be dispositive.

In our view, the supreme court's strong language in Livingston required more notice than what the State gave in this case, which was none. We note that had the State filed an untimely notice or a notice that did not perfectly comply with the requirements, then the outcome of this issue may have been different. See State v. Carter, 121 S.W.3d 579, 585 (Tenn. 2003) (stating that "if notice is filed late or is filed timely but is otherwise defective, the defendant must show prejudice before the notice will be rendered ineffective"). However, because the State completely disregarded the notice requirement, we must conclude that the trial court should have sentenced the appellant as a Range I offender and that the case must be remanded for resentencing. See also State v. Pender, 687 S.W.2d 714, 719-20 (Tenn. Crim. App. 1984) (ordering that defendant be resentenced as Range I offender when State failed to file any notice of intent to seek enhanced punishment).

C. Consecutive Sentencing

The appellant contends that the trial court erred by ordering him to serve his sentences for carjacking and aggravated assault consecutively because the evidence does not support the trial court's conclusion that he is a dangerous offender. The State argues that consecutive sentencing is proper in this case. We conclude that the trial court properly classified the appellant as a dangerous offender and that consecutive sentencing was appropriate in this case.

At the sentencing hearing, the victim testified that the assault and resulting brain injury had ruined his dreams of joining the military. He stated that he had to relearn how to walk, talk, dress himself, and "do everything again basically like a newborn baby." He believed the appellant should serve the maximum sentences.

Constance Lynn Bowman, the victim's mother, testified that the victim could not walk when he woke up but could mumble. Once the victim was moved into rehabilitation, it was three weeks before he could walk, talk, or know where he was. Since the victim was a little boy, he had wanted to join the military. However, the assault had left the victim with a fifteen percent permanent partial disability, concentration problems, and learning problems. She stated that the victim had to be toilet-trained again and that the family had been near bankruptcy. She believed the appellant should serve his sentences in prison. Patricia A. Bowman, the victim's grandmother, testified that the family was still healing and that the appellant should serve the maximum sentences.

Roger L. Wright, a project manager for the Victim Assistance and Advocacy Project at West Tennessee Legal Services, testified that he is a nationally certified victim advocate and that the victim had filed a criminal injuries compensation claim. Two doctors had evaluated the victim, and one concluded that he had "very severe and significant impairments." The victim also had a fifteen percent impairment to the body based on his brain and neuromuscular injuries.

The State introduced the appellant's presentence report into evidence. According to the report, the then twenty-three-year-old appellant was single with several young children. The appellant dropped out of high school in the ninth grade but obtained his GED in prison. In the report, the appellant stated that he began using alcohol and marijuana at age twelve and that he also used cocaine previously. The only employment the appellant reported was a few weeks of farm work, one month of roofing work, and some work as a barber. According to the appellant's statement in the report, he saw no benefit in being honest because "I did that with my case and look at me now . . . I have not committed nor can I accept the charges." The report shows that the appellant has prior convictions for criminal responsibility for selling less than one-half gram of cocaine, misdemeanor aggravated criminal trespass, misdemeanor theft, disorderly conduct, and misdemeanor assault. At sixteen, the appellant was also charged with second degree murder and convicted of voluntary manslaughter. For that offense, he received a ten-year probation sentence, which was revoked when the appellant was charged with other crimes.

In sentencing the appellant, the trial court noted that it had considered the evidence at trial and sentencing, counsel's arguments, enhancement and mitigating factors, the appellant's potential for rehabilitation, and the principles of sentencing. The trial court applied enhancement factors (1),

that the appellant "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (8) that the appellant previously "failed to comply with the conditions of a sentence involving release into the community"; and (10), that the appellant "had no hesitation about committing a crime when the risk to human life was high." See Tenn. Code Ann. § 40-35-114(1), (8), (10). The court noted that the appellant continued to deny that he did anything wrong and concluded that he had a low potential for rehabilitation. The trial court sentenced the appellant as a Range II offender to the maximum punishment for each offense, which was twenty years for carjacking, ten years for aggravated assault, and eight years for theft. See Tenn. Code Ann. 40-35-112(b)(2), (3), (4). The trial court also ordered that the appellant serve eleven months, twenty-nine days at seventy-five percent for the misdemeanor reckless endangerment conviction.

Regarding consecutive sentencing, the trial court concluded that the appellant "is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." Tenn. Code Ann. § 40-35-115(b)(4). In reaching this conclusion, the trial court noted that the victim almost had been beaten to death for his vehicle. The trial court stated that confinement was "necessary to protect society from the Defendant's unwillingness to lead a productive life and the Defendant's resort to criminal activity in furtherance of an anti-social lifestyle." The trial court also stated that consecutive sentencing reasonably related to the offenses. The trial court ordered that the appellant serve his twenty- and ten-year sentences consecutively and that he serve the remaining sentences concurrently with the other two for an effective sentence of thirty years in confinement.

Appellate review of the length, range, or manner of service of a sentence is de novo. See Tenn. Code Ann. § 40-35-401(d). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments. Moreover, if the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. Id. at (d); Ashby, 823 S.W.2d at 169.

Tennessee Code Annotated section 40-35-115(b)(4) provides that a trial court may impose consecutive sentences if a defendant is convicted of more than one offense and the trial court finds by a preponderance of the evidence that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." In State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995), our supreme court held that satisfying Tennessee Code Annotated section 40-35-115(b)(4), by itself, is not sufficient to sustain consecutive sentences. If the defendant is found to be a dangerous offender

under the statute, the trial court must also determine whether the sentences imposed are reasonably related to the severity of the offenses and necessary to protect the public from further criminal activity by the defendant, the "Wilkerson factors." Id. Moreover, trial courts must make specific findings regarding these factors before imposing consecutive sentences. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The trial court in the instant case specifically addressed the Wilkerson factors and made specific findings regarding those factors. We agree with the trial court that the appellant qualifies as a dangerous offender and that consecutive sentencing was proper in this case. However, although not raised by the appellant, the appellant's conviction for misdemeanor reckless endangerment in count 1 must be merged into his conviction for aggravated assault in count 2. Aggravated assault as charged in the indictment occurs when a person "[i]ntentionally or knowingly commits an assault as defined in § 39-13-101 and causes serious bodily injury." Tenn. Code Ann. § 39-13-102(a)(1)(A). The trial court instructed the jury that a person commits assault who "intentionally or knowingly caused bodily injury to another." See Tenn. Code Ann. § 39-13-101(a)(1). Misdemeanor reckless endangerment occurs when a person "recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury." In this case, the appellant's convictions arose out of a single attack involving one victim. Therefore, convictions for both offenses violate double jeopardy protections, and the misdemeanor offense must be merged into the felony offense. See Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 182 (1932); State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996); State v. Adams, 973 S.W.2d 224, 229 (Tenn. Crim. App. 1997).

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the appellant's convictions. However, the trial court erred by sentencing the appellant as a Range II, multiple offender and by failing to merge the misdemeanor reckless endangerment conviction into the aggravated assault conviction. Therefore, we remand the case to the trial court in order for the court to conduct a new sentencing hearing and to resentence the appellant as a Range I, standard offender and for correction of the aggravated assault judgment form to reflect that the misdemeanor reckless endangerment conviction has been merged into that offense.

_____
NORMA McGEE OGLE, JUDGE

-11-